No. 31,699

THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF CLAY, *Plaintiff*, v. WILL J. FRENCH, State Auditor of the State of Kansas, and W. M. JARDINE, State Treasurer of the State of Kansas, *Defendants*.

(33 P. 2d 312.)

Opinion filed June 9, 1934.

*J. H. Wilson*, county attorney, and *Thomas Amory Lee*, of Topeka, for the plaintiff.

*Roland Boynton*, attorney-general, and *Walter T. Griffin*, assistant attorney-general, for the defendants.

The opinion of the court was delivered by

DAWSON, J.: Plaintiff invokes our original jurisdiction in mandamus to require the state auditor and state treasurer to give credit to Clay county for the state's share of uncollected taxes on personal property, as shown by the statutory certificate certified by the plaintiff board and attested by the county clerk.

The case for our decision is formulated by the pleadings and an agreed statement of facts.

It appears that in the year 1930 there was a substantial amount of unpaid personal-property taxes in Clay county. Tax warrants were issued and returned by the sheriff with his indorsement "No property," or "Not found."

A similar situation with similar results occurred in 1931.

The exact amount of the state's share of these uncollected taxes for each year is not shown, but the aggregate for both years was $1,490.78. No claim for credit for these uncollected amounts was made by Clay county in either of the years 1931 or 1932. The full quota of state taxes levied on Clay county for 1930 and 1931 was remitted to the state treasurer in due course and in accordance with the statutes pertaining thereto.

On October 3, 1933, the board of county commissioners certified

and the county clerk attested a claim for credit for the state's share of these uncollected personal-property taxes for the years 1930 and 1931, and it was received and filed by the state auditor two days later.

That officer declined to act on plaintiff's claim, and this action followed to secure an adjudication on the legal questions involved. The state treasurer was impleaded because of his official concern in the controversy.

To a correct determination of the legal questions involved it will be necessary to refer in summary to the main features of our taxation system whereby the state is provided with revenue for current expenses:

On March 1 of each year the township assessors begin their duties of assessing personal property. (R. S. 79-306, 79-309.) They are furnished with blanks supplied by the state tax commission (R. S. 79-1401) and with real-estate rolls prepared by the county clerk (R. S. 79-408). The assessors should complete their work and turn in their reports not later than May 1. (R. S. 79-408.) The county assessor (or county clerk) tabulates these reports (R. S. 79-1412) and the board of county commissioners convenes as a board of equalization on the third Monday in May (R. S. 79-1602). Following the completion of its work, the county clerk makes an abstract of the assessment rolls of the county and forwards it to the state tax commission. (R. S. 79-1604.) On the second Wednesday in July the state tax commission begins to function as a state board of equalization (R. S. 79-1409), and it apportions the amount of tax for state purposes which must be raised by each county, in proportion to the total valuation of its taxable property. On the first Monday in August the board of county commissioners meets for the purpose of making the proper levies, according to the certified financial needs of the various taxing districts. They also levy the proper rate to raise the amount of money required for state revenues as determined by the state tax commission. (R. S. 79-1802, 79-1803.) Taxes become due and payable on November 1 (R. S. 79-1804) and the first half should be paid by December 20. When the taxpayer fails to pay his personal taxes and ignores a notice mailed to him by the county treasurer between the 10th and 15th of January, and likewise of July, and the taxes remain unpaid for thirty days after the July notice, a tax warrant is issued and delivered to the sheriff directing him to levy on the delinquent taxpayer's chattels

as directed in R. S. 1933 Supp. 79-2101. Where no property is found upon which to levy, the sheriff so reports on the tax warrants returned. (R. S. 79-2103, 79-2107.)

As soon as the rush of taxpaying in November and December is over (between January 1st and 20th) the county treasurer is required to send to the state auditor and state treasurer duplicate verified statements of the amount of state taxes he has collected. The county clerk is required to give these state officers similar information following the county treasurer's annual settlement in October. From the information derived from these statements the state auditor from time to time computes the requisite amounts which each county should pay according to the taxes assessed against the county, and the state treasurer draws a draft on the county treasurer for the proportionate amount requisite to meet the state's current expenses. (R. S. 79-2201.)

If double or erroneous assessments have occurred in the county, or if the sheriff has returned tax warrants indorsed "not found," or "no property," the county commissioners and the county clerk are authorized to certify the amount of such double or erroneous assessments and uncollected taxes to the state auditor and state treasurer, and these officers shall credit the county with the proper proportionate amounts the state should bear. (R. S. 79-2203, 79-2916.) No county is required to pay more state tax money than it has collected (R. S. 79-2204); and where the county pays its full quota of state taxes for any one year, all state taxes thereafter collected shall be devoted towards the payments of state taxes for ensuing years. (R. S. 79-2918.) If the full amount of state taxes due from any county is not paid, the state auditor reports that fact to the county clerk in July of each year, and the latter is required to add the necessary percentage to the tax levy to make up the deficit and it is added to and becomes a part of the state tax levy for the next ensuing year. (R. S. 79-2917.)

With the foregoing cursory review of the pertinent statutes before us, although it is greatly abridged, it will be seen that the legislature has not only prescribed a method of providing the state with needed revenues, but it has descended into particular details touching the assessments within each county, the state's requirements apportioned, each county's quota determined, the state levy imposed, collected and paid; and specific provision is made for credit where the state tax is not collected.

All these matters must be observed in their time and season, and while it may be conceded that there is no specific provision of statute which would bar a county from obtaining credit in 1933 for uncollected personal property taxes in 1930 and 1931, there is a very obvious administrative bar which prevents this court from issuing its discretionary writ commanding the state auditor and state treasurer to give Clay county such credits. It can readily be seen that it would seriously upset the state's fiscal calculations for 1933 to have its expected revenues for that year depleted by belated demands for credits for uncollected state taxes in 1930 and 1931. Moreover, there is no claim here, and there can be none, that Clay county has paid one dime for state taxes in 1930 and 1931 which the county has not collected from its taxpayers for that specific purpose. It cannot be said that the general fund of Clay county has sustained a deficit because of the uncollected state taxes of 1930 and 1931. It can be discerned, of course, that the general body of taxpayers of Clay county have contributed somewhat more state taxes in 1930 and 1931 than they were required to pay, but that remote possibility was not anticipated by the legislature, and the statutes cannot be amended to provide for it by judicial mandate.

Attention is called to our recent cases, *Nemaha County Comm'rs v. City of Seneca,* 138 Kan. 895, 28 P. 2d 1034; *Greenwood County Comm'rs v. School District,* ante, p. 297, 31 P. 2d 723; *Harvey County Comm'rs v. School District,* ante, p. 457, 32 P. 2d 812, and *Woodson County Comm'rs v. City of Yates Center,* ante, p. 519, 32 P. 2d 209. In all of these, however, the action was for money had and received, which is quite a different matter from mandamus. (*Kolster v. Gas Co.,* 106 Kan. 84, 86, 186 Pac. 739.) To grant the writ prayed for in the present case would be tantamount to sanctioning a suit against the state for money had and received. Such suit, of course, would not lie against the state directly, but neither can it be countenanced indirectly by mandamus.

In view of the conclusion reached above, the other legal questions suggested in the briefs need no present consideration.

The writ is denied.